Arbona Lago, Juez Ponente
TEXTO COMPLETO DE LA SENTENCIA
Antecedentes
En Noriega v. Hernández Colón, 122 D.P.R. 650 (1988), nuestro más alto foro reconoció y declaró inconstitucional la persecución oficial y sistemática del Estado por actividades no delictivas de individuos, evidenciada por la práctica de iniciar, actualizar y preservar expedientes, carpetas, listas, ficheros y demás, de personas, agrupaciones y organizaciones, única y exclusivamente por creencias o tendencias políticas e ideológicas. Véase, Noriega v. Hernández Colón, 130 D.P.R. 919 (1992); Medina Morales v. Cruz Manzano, Opinión de 11 de octubre de 1996, 141 D.P.R. 635 (1996).
Como corolario de lo resuelto en las citadas decisiones, fueron presentadas en distintas salas del entonces Tribunal Superior múltiples reclamaciones civiles contra el E.L.A., requiriendo indemnización por los daños sufridos a consecuencia de dicha práctica declarada inconstitucional. El primero de estos casos, Fernández Pola y otros v. E.L.A., Civil Núm. ADP90-0945, fue presentado ante la Sala de San Juan del entonces Tribunal Superior. Posteriormente, otros siguieron, y entre los cuales se encuentra el caso de Vives Vázquez v. E.L.A. y *791 otros, Civil Núm. BAC93-0013 (Aibonito).
Ante la proliferación de tal tipo de litigio en diferentes salas del Tribunal de Primera Instancia y presentando cuestiones comunes de hecho y de derecho la controversia, el Estado solicitó la consolidación de causas.
Conforme a la facultad inherente que para administrar el sistema judicial tiene el Tribunal Supremo de Puerto Rico y dada la similar naturaleza de las citadas causas y su proliferación ante las diferentes salas del Tribunal de Instancia, el Juez Presidente designó un Juez Superior para que atendiera todos los casos ante el foro de Instancia que se encontraran pendientes de trámite. Vives Vázquez v. E.L.A., 142 D.P.R. 16 (1996). Le correspondió entonces al E.L.A. informar al Tribunal Superior designado respecto al número de pendientes que procedían ser consolidados o agrupados para su trámite y disposición.
Se ordenó además que los casos continuarían en las salas en que habían sido presentados, hasta tanto el juez designado dispusiera otra cosa. El magistrado a cargo actuaría como juez itinerante, facilitando así el acceso de las partes y los litigantes al tribunal de justicia.
Primeramente, se designó al Juez del Tribunal Superior, Hon. Oscar Dávila Suliveres, para presidir todos los casos comprendidos en dicha orden. Al cese de labores del Juez Dávila Suliveres, se designó a la Hon. Jueza Julia Garriga Trillo para atender las causas.
Mediante resolución de 14 de marzo de 2000, las mencionada causas fueron clasificadas por el Tribunal de Primera Instancia como de litigación compleja, conforme a lo dispuesto en las "Reglas para Casos Civiles de Litigación Compleja", en Resolución de 30 de junio de 1999, 99 J.T.S. 120.
Próximo a comenzar el juicio en su fondo en las causas consolidadas, el demandante Julio Vives Vázquez presentó el 28 de abril y 18 de mayo de 2000, respectivamente, los recursos del epígrafe denominados KLCE-2000-00477 y KLCE-2000-00532. De otra parte, el grupo de demandantes encabezados por Rosali Fernández Pola, presentó el certiorari KLCE-00-00510, el 12 de mayo de 2000.
Posteriormente, mediante resolución de 19 de mayo de 2000, este Tribunal refirió las causas del epígrafe, a la Secretaría a fines de que las asignara al Panel Especial designado para atender los casos de litigación compleja, a tenor con lo dispuesto por la Regla 18 de las "Reglas para Casos Civiles de Litigación Compleja" y la Orden Administrativa TCA-99-178. El 31 de mayo de 2000, se ordenó la consolidación de las causas del epígrafe y se concedió a las partes términos para comparecer y exponer.
Así las cosas y habiendo comparecido las partes, la causa consolidada del epígrafe fue reasignada a este panel el día 15 de mayo de 2001, proveniente del Panel I del Circuito Regional de Bayamón, el cual había sido designado originalmente como el Panel Especial de litigación compleja. La causa está sometida y procedemos a resolver.
En aras de la economía procesal y para obtener una mayor claridad en la exposición, discutiremos primero las controversias presentadas en los recursos KLCE-QQ-00477 (Vives Vázquez) y KLCE-00-00510 (Fernández Pola), por entender que están íntimamente relacionadas entre sí. Luego discutiremos la situación procesal expuesta en el recurso KLCE-00-0053 (Vives Vázquez).
I
Julio Vives v. E.L.A. y A.A.A., KLCE-00-00477; Rosali Fernández Pola y otros, KLCE-00-00510.
*792 Hechos
Los demandantes-peticionarios solicitan la revisión de la resolución dictada el 14 de marzo de 2000, por la compañera Julia Garriga Trillo del Tribunal de Primera Instancia, Sala Superior de San Juan. En la misma, el hermano foro de Instancia resolvió lo siguiente:

"[L]a anuencia, patrocinio y endoso del gobierno del Estado Libre Asociado de Puerto Rico para que se fabricaran expedientes 'Carpetas' utilizando como criterio rector las tendencias políticas e ideológicas de las miles de personas que reclamaron ser indemnizadas al ser declarada inconstitucional dicha práctica, constituye un sólo acto o evento de carácter continuo generador de los daños sufridos por los demandantes, al enfrentarse con la realidad de que habían sido fichados por sus tendencias e ideología política. Siendo ello así, la reclamación por la confección del expediente o 'carpeta' le es de aplicación el límite de ciento cincuenta mil dólares ($150,000) establecido por la Ley 104 de 29 de junio de 1955, según enmendada, para el caso de varios demandantes por un mismo acto o evento culposo atribuible al Estado. En el caso de autos, el acto culposo consistió en permitir, endosar y patrocinar la confección de expedientes o 'carpetas'por las tendencias políticas o ideológicas de los perjudicados."

En adición, Instancia se negó a declarar la inconstitucionalidad de la Ley 104, como solicitaron los demandantes.
Inconformes con lo resuelto, los demandantes-peticionarios del epígrafe presentaron los recursos KLCE-00-00477 y KLCE-00-00510, el 1ro. de mayo y 12 de mayo de 2000, respectivamente.
El peticionario Julio Vives Vázquez (KLCE-00-00477), le imputó a Instancia la comisión de los siguientes tres errores:

"Primer Error

Erró el honorable Tribunal al dictar la resolución recurrida sin dar participación a la parte demandante en el proceso conducente a la misma, lo que violó el debido proceso de ley y la igual protección de las leyes.

Segundo Error

Cometió error el Tribunal de Instancia al resolver que la fabricación de expedientes o carpetas utilizando como criterio rector las tendencias políticas e ideológicas de miles de personas, por distintos actores, en distintas fechas, contra distintas personas y realizando cientos de miles de distintos actos, constituye un sólo acto o evento de carácter continuo.

Tercer Error

Los límites establecidos por ley son inconstitucionales de su faz y en su aplicación al caso de autos, según esta aplicación ha sido hecha en la resolución recurrida."

De otra parte, los peticionarios Rosali Fernández Pola et al. (KLCE-00-00510), le imputaron los siguientes errores:

"Primer Error

Erró el Honorable Tribunal de Instancia al equiparar la práctica de persecución y discrimen por ideología política llevada a cabo por el Estado durante varias décadas, a la confección de las carpetas o expedientes mantenidos por el Estado y concluir a base de ello, que dicha práctica era un sólo acto continuo sujeto al límite de $150,000.00 establecido en la Ley 104.

*793
Segundo Error

Erró el Honorable Tribunal de Instancia en su apelación de la Ley 104 a los hechos del presente caso y al determinar que todos los demandantes que reclamen por razón de la práctica declarada inconstitucional en los casos Noriega Rodríguez v. Hernández Colón, 122 D.P.R. 650 (1988) y Noriega v. Gobernador, 130 D.P.R. 919 (1992), son acreedores en únicamente y en conjunto al límite de $150,000, dispuesto en dicho estatuto, como compensación por los daños causados por el Estado.

Tercer Error

Erró el Honorable Tribunal de Instancia al negarse a declarar inconstitucional la Ley de Pleitos contra el Estado según enmendada, Ley 104 del 29 de junio de 1955, 32 L.P.R.A. See. 3077, et seq."

Luego de varios incidentes procesales y habiendo comparecido el E.L.A. mediante memorando consolidado, en cumplimiento de orden para mostrar causa, estamos en posición de dilucidar y resolver.
Exposición y análisis
A
Como primer error señalado, la parte demandante-peticionaria, Sr. Vives Vázquez, plantea que:

"Erró el honorable Tribunal al dictar la resolución recurrida sin dar participación a la parte demandante en el proceso conducente a la misma, lo que violó el debido proceso de ley y la igual protección de las leyeSi"

De los autos surge que el E.L.A. presentó un escrito titulado "Memorando de Derecho del Estado Libre Asociado Respecto a Límites de Responsabilidad Monetaria al Amparo de la Ley de Pleitos contra el E.L.A." el 1ro. de octubre de 1999, ante la Sala Superior de Aibonito, Tribunal de Primera Instancia. En el primer inciso del escrito, la parte demandada afirma que el mismo se presenta en cumplimiento del mandato del foro de Instancia, con el fin de analizar la aplicabilidad de los límites de compensación monetaria impuestos por la Ley Núm. 104 de 29 de junio de 1955, según enmendada, "Ley de Pleitos contra el Estado", 32 L.P.R.A. see. 3077 et seq. Al final del escrito, la parte demandada certifica haber notificado el mismo a los representantes legales del Sr. Vives Vázquez.
Debemos resaltar el hecho de que no es hasta el 14 de marzo de 2000 que Instancia finalmente dicta resolución en cuanto a la aplicabilidad de la "Ley de Pleitos contra el Estado" en el caso de autos, es decir cinco (5) meses después de que el E.L.A. radicara su memorando de derecho. Durante ese período, la parte demandante-peticionaria, Sr. Vives Vázquez, no presentó posición en cuanto a esta controversia.
El peticionario plantea que no se le concedió la debida oportunidad de expresar su posición sobre el asunto, al éstos no haber sido notificados formalmente por el Tribunal de que ello estaba planteado ante su consideración en vías de ser resuelto. Alega que cuando el Tribunal afirma haber considerado los planteamientos de las partes, se refiere a otros litigantes que figuran como demandantes y que tuvieron oportunidad de comparecer, mas no a ellos. De conformidad, solicita que revoquemos la referida resolución, y devolvamos la controversia para que luego de su comparecencia, la misma sea resuelta por otro juez. Aboga por la designación de un nuevo juez como la única alternativa para asegurarle un debido proceso de ley, al entender que el actual juez estaría prejuiciado al éste haber ya decidido y adjudicado la controversia.
Si, en efecto, la parte peticionaria fue notificada del memorando de derecho presentado por el E.L.A. el 1ro. de octubre de 2000, hecho que surge del "Certifico" del propio documento, y no ha sido refutado por la parte peticionaria, éstos no pueden alegar que no tuvieron oportunidad de expresarse en el asunto. Contaron con cinco (5) meses para comparecer, durante los cuales permanecieron cruzados de brazos. Dicha inacción es la causa de *794 que Instancia resolviera el asunto sin contar con la comparecencia de una de las múltiples partes demandantes en esta, acciones consolidadas.
En todo caso, la controversia ante nos, en cuanto a la aplicabilidad de los límites impuestos por la Ley 104, es de derecho y estamos en condición de resolver, para lo cual contamos con la comparecencia del Sr. Vives Vázquez. El asunto reúne múltiples planteamientos en contra de la aplicabilidad de la referida ley. Todos los argumentos de derecho serán considerados al tomar nuestra decisión.
Resolvemos, pues, que el peticionario tuvo amplia oportunidad de presentar su posición ante Instancia, por lo que no se le violentó el debido proceso de ley.
B
Constitucionalidad de la Ley 104
Los demandantes-peticionarios del epígrafe atacan la constitucionalidad de la Ley Núm. 104 de 29 de junio de 1955, según enmendada, "Ley de Pleitos contra el Estado", 32 L.P.R.A. see. 3077 et seq., tanto de su faz como en su aplicación. En particular, cuestionan la constitucionalidad de los límites establecidos en las cuantías por las cuales responderá el E.L.A. según dispone la Ley Núm. 30 de 25 de septiembre de 1983, la cual enmendó la"Ley de Pleitos contra el Estado". En lo pertinente, dicha disposición reza de la siguiente manera:

"§ 3077. Reclamaciones y acciones contra el Estado Libre Asociado - Autorización.

Se autoriza demandar al Estado Libre Asociado de Puerto Rico ante el Tribunal de Primera Instancia de Puerto Rico por las siguientes causas:

(a) Acciones por daños y perjuicios a la persona o a la propiedad hasta la suma de setenta y cinco mil (75,000) dólares causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo, interviniendo culpa o negligencia. Cuando por tal acción u omisión se causaren daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un sólo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma de ciento cincuenta mil (150,000) dólares. Si de las conclusiones del tribunal surgiera que la suma de los daños causados a cada una de las personas excede de ciento cincuenta mil (150,000) dólares, el tribunal procederá a distribuir dicha suma entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. Cuando se radique una. acción contra el Estado por daños y perjuicios a la persona o a la propiedad, el tribunal ordenará, mediante la publicación de edictos en un periódico de circulación general, que se notifique a todas las personas que pudieran tener interés común, que deberán comparecer ante el tribunal, en la fecha dispuesta en los edictos, para que sean acumuladas a los fines de proceder a distribuir la cantidad de ciento cincuenta mil (150,000) dólares entre los demandantes, según se provee en las sees. 3077 et seq. de este título."

Recientemente, en Defendini Collazo et al. v. E.L.A., Cotto, 134 D.P.R. 28 (1993), nuestro más alto foro tuvo la oportunidad de expresarse en tomo a la constitucionalidad de los límites fijados por la "Ley de Pleitos contra el Estado", según enmendada, 32 L.P.R.A. § 3077. En tal ocasión, se presentaron tres argumentos principales en el planteamiento de inconstitucionalidad. En primer lugar, señalaron que la doctrina de la inmunidad soberana era contraria a nuestro ordenamiento constitucional, por contar con origen histórico ajeno a nuestro sistema. En segundo lugar, señalaron que la Ley 104 creaba un discrimen inconstitucional que violentaba la garantía de igual protección de leyes. Finalmente, argumentaron que la disposición estatutaria en cuestión es arbitraria y constituye una violación del debido proceso de ley en su vertiente sustantiva. Defendini Collazo et al. v. E.L.A., Cotto, supra, a la pág. 56.
*795 En cuanto al primer planteamiento, el Tribunal concluyó que los redactores de nuestra Constitución no encontraron incompatibilidad entre ésta y la doctrina de inmunidad del soberano. Resolvió que del estudio del debate suscitado en la Convención Constituyente se podía deducir claramente que la posición mayoritaria rechazó establecer una responsabilidad absoluta del E.L.A. Su posición era más bien a favor de una renuncia condicionada a la inmunidad del Estado, según fuera ésta dispuesta por la Asamblea Legislativa en el ejercicio de su amplio poder de reglamentación. Defendini Collazo et al. v. E.L.A., Cotto, supra, a las págs. 58-59.
Respecto al segundo planteamiento, el de igual protección de las leyes, el Tribunal lo descartó al elegir utilizar el escrutinio de nexo racional, por ser la legislación una de naturaleza socioeconómica, y así concluir que bajo la Constitución del E.L.A. no existe un derecho fundamental a recibir una compensación total por daños. Conforme a ello, resolvió que las clasificaciones establecidas por la Ley 104 mantenían un nexo racional con el interés que el Estado procuraba avanzar, por lo que no violenta la garantía de igual protección de la leyes. Defendini Collazo et al. v. E.L.A., Cotto, supra, a las págs. 70-72. Además, dispuso que: "Si por razón del transcurso del tiempo y el desarrollo de la economía [entiéndase devaluación de la moneda o aumento de la capacidad económica del Estado], debieran revisarse los límites dispuestos en 1983 [Ley Núm. 30), ésta es labor que le corresponde a la Asamblea Legislativa" en primera Instancia. Id. a la pág. 73.
Por último, en cuanto a la alegada violación al debido proceso de ley, en su aspecto sustantivo, el Tribunal resolvió que la selección de los límites ($75,000 y $150,000) está válidamente fundamentada de evidencia relativa al impacto económico que tienen en el fisco la reclamaciones contra el E.L.A.; por lo tanto, ello cuenta con un fundamento racional y no son claramente arbitrarios. Defendini Collazo et al. v. E.L.A., Cotto, supra, a la pág. 75. Véase, además, González Pérez v. E.L.A., 138 D.P.R. 399 (1995).
En el caso de marras, los demandantes-peticionarios nos invitan a reabrir la discusión sobre la constitucionalidad de los límites establecidos por la Ley 104, para reconsiderar lo resuelto por nuestro Tribunal Supremo en Defendini. Sus argumentos giran, en gran medida, en tomo al aparente desfase entre los límites a las cuantías y el estado actual de la economía; y en tomo a la alegación de que se le está violando un derecho fundamental al ciudadano.
En Defendini, el Tribunal Supremo no se limitó a sostener la constitucionalidad de la Ley 104, sino que se ocupó además de contestar algunas interrogantes que resultan pertinentes a la controversia de autos. Respecto a las cuantías, debemos recalcar lo allí expresado: "Si por razón del transcurso del tiempo y el desarrollo de la economía debieran revisarse los límites dispuestos en 1983 [Ley Núm. 30], ésta es una labor que le corresponde a la Asamblea Legislativa". Defendini Collazo et al. v. E.L.A., Cotto, supra, (énfasis suplido). Al incluir dicha frase, el Tribunal anticipó, tras diez (10) años de haber sido establecidas a las cuantías, futuros cuestionamientos en cuanto a quién le correspondía la revisión de las mismas. Por tanto, no nos corresponde resolver al respecto, ni podemos revisar o modificar los límites de responsabilidad, ya que dicha facultad es una de política pública reservada en primera instancia a la Asamblea Legislativa.
En cuanto a la violación de derechos fundamentales, cabe recordar que la opinión del Tribunal en Defendini resolvió, como mencionáramos anteriormente, que no existe un derecho fundamental a reclamar del Estado y recibir una compensación total por daños, por lo que se implemento el escmtinio de nexo racional, en lugar del estricto. La legislación que fija las actuales cuantías de $150,000 y $75,000, cumple con el requisito del escmtinio de nexo racional, mediante el cual se presume la constitucionalidad de la ley y sólo se declara inválida si la misma es claramente arbitraria y no puede establecerse nexo racional alguno entre la misma y un interés legítimo del estado. Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975).
En el caso de autos, no encontramos suficientes razones que nos induzcan a modificar para llegar a concluir que el recibir compensación total por los daños, es decir sin el límite máximo pre-establecido hoy día, constituye un derecho fundamental protegido por nuestra constitución. 
*796 En cuanto a lo resuelto en Alemán Martínez v. E.L.A., Resolución de 1ro. de mayo de 1998, 98 J.T.S. 52 (al que aluden los demandantes-peticionarios en sus respectivos escritos), entendemos que no modifica el estado de derecho vigente. En aquella ocasión, el Tribunal Supremo resolvió no expedir el auto, en donde se le solicitaba que revocara una decisión de Instancia en la que se le aplicaron los límites establecidos en la Ley 104, a una acción instada bajo el Artículo 404 del Código Político de 1902, según enmendado, 3 L.P.R.A. see. 422. A lo que los demandantes-peticionarios hacen referencia es a unas expresiones hechas por la Hon. Jueza Naveira de Rodón, mediante voto particular disidente.
En tal voto disidente se aboga por la no aplicación de los límites a las acciones bajo el Artículo 404 del Código Político, mas no porque se declare inconstitucional los límites o la Ley 104 como tal. Las frases citadas por los demandantes-peticionarios consideran que sería más conveniente que no existan los límites a las cuantías, y por tanto, el Estado responda en forma total al igual que cualquier ciudadano particular, pero no constituyen jurisprudencia. Sin embargo, la Asamblea Legislativa, a quien le corresponde establecer dicha política pública, cree en la conveniencia de los límites, tanto para el ciudadano, como para el Estado, dentro de la relación global de Estado-ciudadano, interés común e individual. No surge del voto disidente un llamado a revocar lo resuelto en Defendini, como aparentan indicar los demandantes-peticionarios.
C
Acto o evento continuo 
La "Ley de Pleitos contra el Estado" actualmente autoriza "[ajcciones por daños y perjuicios a la persona o a la propiedad hasta la suma de setenta y cinco mil (75,000) dólares causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo, interviniendo culpa o negligencia". Añade que "[cjuando por tal acción u omisión se causaren daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un sólo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma ciento cincuenta mil (150,000) dólares". (Enfasis suplido).
Según los hechos que esta causa informa, el evento o el acto u omisión que se le imputa al gobierno y por el cual se solicita indemnización, a raíz de lo resuelto en Noriega v. Hernández Colón, supra, y su progenie, consiste en la persecución oficial y sistemática de individuos y agrupaciones por actividades no-delictivas, relacionadas con sus creencias o tendencias políticas e ideológicas. Dicha práctica quedó evidenciada por la confección, levantamiento, actualización y preservación de expedientes, carpetas, listas, ficheros y demás. Noriega v. Hernández Colón, supra. Por tanto, las "carpetas" contienen la evidencia de aquellos actos ilícitos de persecución perpetuados por el gobierno, por la cual los afectados solicitan la reparación de agravios, los cuales no se limitan al sufrimiento causado al enterarse de la existencia de la "carpeta".
Habiéndose ya denominado la mencionada persecución oficial sistemática de individuos, por realizar ciertas actividades no-delictivas, como el acto o evento que deberá ser considerado como el causante de posibles daños y peijuicios, que tendrán que ser probados en su día, es menester atender tal parámetro al resolver cómo se aplicarán los límites de cuantías impuestos por la "Ley de Pleitos contra el Estado" al asunto aquí en controversia.
La referida Ley limita hasta un máximo de setenta y cinco mil dólares ($75,000) la compensación estadual a cada persona que haya sufrido daños a causa de acto u omisión por agente o funcionario del Estado. Se concederán hasta setenta y cinco mil dólares ($75,000) por cada individuo o por cada causa de acción, disponiendo que nunca se excederá de ciento cincuenta mil dólares ($150.000) por la totalidad de los daños que surjan de ese acto u omisión por parte del Estado.
En el caso de autos, no podemos aceptar la tesis de que la persecución sistemática efectuada por el Estado hacia miles de individuos y agrupaciones durante más de tres décadas, constituye un sólo acto o evento de *797 carácter continuo perpetuado por el Estado y generador de los daños sufridos por la totalidad de los demandantes. Aunque tales límites de responsabilidad comprendan una directriz general, los hechos que esta causa informa obligan a concluir que la persecución de cada individuo constituye un acto aparte o separado del Estado, que implica intervenir con diversas personas y la implementación de diferentes métodos y estrategias para cada cual. Varían además en cuanto al tiempo dedicado a cada individuo u organización respecto a la severidad de las medidas utilizadas en contra de los distintos intervenidos o sujetos de vigilancia.
Estudiada la jurisprudencia interpretativa de la Ley 104, no podemos concluir que todas las manifestaciones de esta conducta al margen de la ley, por tantos años y contra tantas personas, pueda considerarse como un único y sólo acto generador de responsabilidad.. El Estado puede válidamente exponer que todos los casos de accidentes automovilísticos, mala práctica médico-hospitalaria, etc., incurridos por el Estado dentro de algún período de tiempo (digamos un año), frente al universo del grupo así afectado, constituyen una sola categoría, tipo o renglón de negligencia y responsabilidad por el cual el Estado sólo responde en el agregado y hasta el monto máximo de $150,000. Tampoco encontramos situaciones en las que se haya resuelto que el Estado responderá hasta un máximo de $150,000, por la totalidad de daños causados por múltiples actos culposos, perpetuados por múltiples agentes, entidades y funcionarios, durante distintos y prolongados períodos de tiempo; a su vez causantes de una diversidad de daños a cientos de personas no relacionadas entre sí, aunque ello ocurra al repetirse reiteradamente una misma conducta culposa. Aquí no estamos ante un sólo acto u omisión culposa de carácter continuo y motivado por un sólo impulso, del cual surgen múltiples causas de acción. Nos enfrentamos ante cientos de actos de persecución, tantos como personas o entidades perseguidas que a pesar de estar motivados por razones similares, durante años, nacen de diferentes impulsos y determinaciones que a su vez generan múltiples causas de acción a favor de un millar de personas civiles o jurídicas.
Denominamos "carpeta" al conjunto de documentos que evidencian toda la persecución del Estado por razones no delictivas relacionadas a este litigio respecto a cada persona o entidad, independiente del lapso de tiempo en que tal actividad ilegal fue conducida por el Estado en cuanto a cada sujeto, sin importar el número de folios o cartapacios que se requieran para su colección y guarda.
Cada individuo u organización a quien se le haya perseguido por razones no delictivas y como consecuencia se le haya confeccionado alguna "carpeta" a su nombre, tiene al menos una causa de acción personal, la cual podrá ser individualmente compensada hasta un máximo de $75,000 conforme la prueba de daños lo amerite. En aquellos casos en que el acto hacia la persona o entidad haya dado base para más de una causa de acción, como lo sería el caso en que uno o más familiares del perseguido hayan también sufrido daños como consecuencia de los actos del Estado contra el primero y que además figuren como demandantes, la compensación total por persona perseguida no podrá exceder del máximo agregado de $150,000, que establece la ley.
Dictamen
Conforme a lo expuesto, expedimos el auto de certiorari para modificar la resolución recurrida y resolver que la persecución sistemática de individuos y organizaciones perpetuada por el Estado y evidenciada por la confección de "carpetas", constituye un acto independiente en cada caso y en contra de cada uno de los intervenidos, sujeto cada caso por separado a los límites de $75,000 a $150,000 establecidos por la "Ley de Pleitos contra el Estado". Resolvemos que no es correcto considerar tal conducta como un sólo acto o evento continuo, causante de múltiples daños y, por tanto, limitado al máximo compensacional de $150,000 para todos los reclamantes.
II
Julio Vives v. E.L.A. y A.A.A., KLCE-00-00532.
*798 Hechos
El Sr. Julio Vives Vázquez, de 78 años de edad, es uno de los cientos de puertorriqueños a quien el Gobierno de Puerto Rico le confeccionó una de las llamadas "carpetas", mientras alegadamente se le perseguía por actividades no-delictivüs, durante tres décadas. Luego de que dicha práctica fuese declarada inconstitucional, el Sr. Vives Vázquez presentó demanda contra el E.L.A. y la A.A.A., entre otros, el día 3 febrero de 1993, ante la Sala de Aibonito del entonces Tribunal Superior.
Luego de múltiples incidencias procesales y retrasos, entre ellas la paralización de los procedimientos y la consolidación de todos los casos referentes a las "carpetas", los demandados, A.A.A. y el E.L.A., contestaron la demanda el 16 de abril de 1993 y el 15 de diciembre de 1997, respectivamente. Mientras tanto, el demandante dio inicio al período de descubrimiento de prueba, al enviar su primer pliego de interrogatorios el 29 de abril de 1993.
Posteriormente, luego de siete (7) años de comenzada la acción civil, habiéndose celebrado numerosos trámites y señalamientos, fue celebrada una vista sobre el estado de los procedimientos el día 7 de febrero de 2000, en la que la parte demandante entregó el informe del perito, Sr. Leroy López, y anunció que presentaría enmiendas al mismo el 14 de febrero de 2000. Anunció además que en la vista del caso en su fondo utilizaría al menos dos peritos adicionales, el Sr. Pablo Rivera, quien testificaría sobre la construcción de la imagen del independentismo, y el Ledo. Juan Mari Bras, quien abundaría sobre la imagen del independentismo y hablaría sobre la persecución padecida por el Sr. Vives Vázquez. La defensa informó que planeaba utilizar un perito adicional. En respuesta a ello, el Tribunal le concedió un plazo de quince (15) días para anunciar cualquier otro perito, con la advertencia de que no podrían utilizar en la vista en su fondo ningún perito anunciado luego de vencer dicho término.
Quedó así establecido que la parte demandada sólo había anunciado al propio demandante como único testigo y el hermano foro de Instancia advirtió que cualquier testigo adicional debería ser anunciado en o antes del 7 de marzo de 2000. Luego, las partes aprovecharon para anunciar que aún no había finalizado la deposición del demandante, Sr. Vives Vázquez, para lo que el tribunal señaló fecha en que debía finalizarse la misma. Quedaron pautadas además las fechas para las deposiciones de los peritos anunciados por la parte demandante, el Sr. Pablo Rivera y el Ledo. Juan Mari Bras. Por último, el Tribunal concedió treinta (30) días a la A.A.A. para que anunciara los testigos que pensaba utilizar en el juicio en su fondo, y señaló el 12 de mayo de 2000 como la fecha límite para que las partes radicaran el informe conjunto de la conferencia con antelación al juicio. Luego de fijar el calendario a segur, señaló el juicio en su fondo a celebrarse en la Sala de Aibonito del 23 al 26 de mayo de 2000.
Posteriormente, el 14 de marzo de 2000, el E.L.A. radicó moción mediante la cual solicitó que no se le permitiera al demandante anunciar cualquier nuevo perito por haber ya vencido el término concedido para ello. Dicha moción fue declarada Ha Lugar, sin mayor dilación ese mismo día.
Como respuesta a dicha determinación, la parte demandante presentó moción el 31 de marzo de 2000 solicitando que se le prohibiera también a las partes demandadas utilizar cualquier testigo o perito no anunciado a esa fecha. 
Así las cosas, el 18 de abril de 2000, Instancia notificó resolución dictada el 5 de abril, disponiendo que tal y como había sido solicitado por los demandados, el término del cual éstos disponían para anunciar sus testigos y peritos, dependía del contenido del informe del perito que presentara la parte demandante. Concluyó que los demandados, aquí recurridos, habían cumplido a cabalidad con su responsabilidad de informar los peritos y testigos que utilizarían durante el juicio, al anunciarlos en un término razonable desde que depusieron al perito de la parte demandante. Conforme a ello, y a manera de "excepción", concedió a la parte demandante un plazo a vencer el 1ro. de mayo de 2001, para que depusieran a cualquier testigo o perito de los anunciados por los demandados. En adición, le ordenó a la A.A.A. que informara la dirección de sus testigos y la acompañara de un breve resumen de su testimonio, en un plazo máximo de diez (10) días.
*799 De otra parte, el 14 de abril de 2000, el E.L.A. presentó el informe de los peritos que se proponía utilizar en el caso. La A.A.A. hizo lo correspondiente en cuanto a sus testigos, el 27 de abril de 2000.
Así las cosas, la parte demandante presentó la causa KLCE-00-00532 el 18 de mayo de 2000, solicitando que revoquemos la resolución dictada por Instancia el 5 de abril de 2000, y que al así actuar resolvamos que los demandados-recurridos no podrán presentar testigos durante el juicio por no haberlos anunciado oportunamente. Levantó contra el foro de Instancia la comisión del siguiente error:
"Cometió error el Tribunal de Primera Instancia al aplicar a las partes normas distintas sobre descubrimiento de prueba y la utilización de testigos en el juicio."
Las partes demandadas, E.L.A. y A.A.A., comparecieron mediante escritos en oposición a certiorari, el 8 y 16 de junio de 2000, respectivamente. Habiéndonos sido reasignada la causa del epígrafe el 14 de mayo del corriente, nos encontramos en posición de resolver y así lo hacemos.
Exposición y análisis
Luego de siete años de presentada la demanda, el juicio en su fondo estaba supuesto a comenzar el 23 de mayo de 2000. Tal y como mencionáramos, este Tribunal ordenó la paralización de los procedimientos mediante resolución dictada el 19 de mayo de 2000.
A esta fecha, han pasado más de ocho años desde que fuera entablada esta acción civil. También ha transcurrido un año desde que este recurso fuera presentado. La parte demandante alega que Instancia no le ha brindado un tratamiento equitativo a las partes, al permitirle a los demandados-recurridos (E.L.A. y A.A.A.) anunciar testigos y peritos en fecha posterior a la dispuesta para la parte demandante.
Primero que nada, debemos señalar que en su escrito la parte demandante-peticionaria no indica que Instancia le haya privado de la oportunidad de presentar testigo o perito alguno. Tampoco incluye o identifica algún testigo o perito en particular que desee incluir o añadir y la razón o el porqué de la necesidad para ello. Cualquier intervención nuestra en esta etapa para resolver en cuanto a la presentación de testigos no anunciados por la parte demandante-peticionaria, sería prematura y especulativa, ya que dicha parte aún no ha hecho un reclamo a Instancia sobre ese particular.
Por lo tanto, no estamos aquí ante una situación en se le esté violentando a la parte peticionaria su derecho a ser escuchado o que se le esté limitando de alguna manera su capacidad para litigar el caso. En cuanto a esto último, la única alegación meritoria que formula la parte peticionaria se reduce a que la atacada resolución no le proveía una oportunidad genuina o legítima para deponer a los testigos y peritos anunciados por los demandados-recurridos, a pesar de reconocerle el derecho a la deposición.
Ello era así, dado que, ante la inminencia del comienzo del juicio en su fondo pautado para el 23 de mayo de 2000, la referida resolución, notificada el 18 de abril, establecía el 1ro. de mayo de 2000 como fecha límite para que la parte demandante depusiera al perito y testigos anunciados por los demandados-recurridos. Dicho plazo, en efecto, resultaba uno demasiado corto al considerar que no fue hasta el 14 de abril de 2000 que el E.L.A. presentó el informe de su perito, y hasta el 27 de abril de 2000 que la A.A.A. cumplió con entregar el resumen del testimonio de sus testigos.
Entendemos las razones que motivaron al hermano foro de Instancia a establecer tan apretado calendario. Actuó en ánimos de evitar posponer nuevamente la fecha señalada para el inicio del juicio en su fondo, en un caso que para esa fecha llevaba litigándose por más de siete años y cuya multiplicidad de partes dificultaba grandemente la selección de fechas hábiles’para calendarización. Sin embargo, tal determinación le imponía a la parte demandante-peticionaria una carga un tanto onerosa y limitativa, en cuanto a lograr una preparación adecuada para el juicio. A fin de cuentas, resultó imposible comenzar el juicio el 23 de mayo de 2000, por lo que *800 inevitablemente fueron suspendidos los señalamientos.
Así las cosas, en este momento, a más de un año de paralizados los procedimientos, Instancia tendrá que establecer un nuevo orden de calendario y fijar nuevamente la fecha para el comienzo del juicio, tan pronto reciba el mandato en esta causa. Por lo tanto, resulta también académico el planteamiento de la parte demandante-peticionaria respecto a que la información solicitada en cuanto a los testigos y peritos que la parte demandada presentaría en la vista en su fondo le había sido divulgada en una fecha demasiado cercana al juicio. Sin embargo, reconocemos el derecho que siempre asiste al peticionario para deponer a tales peritos o a utilizar los mecanismos de descubrimiento de prueba, si así lo desean o lo entienden necesario. Conforme a ello, ordenamos que Instancia, al preparar el nuevo calendario de procedimientos, le provea de un término razonable al peticionario para deponer al perito y testigos anunciados por el E.L.A. y la A.A.A., respectivamente. 
En cuanto a la determinación de Instancia, de permitirle a los demandados-recurridos (E.L.A. y A.A.A.), utilizar el perito y los testigos anunciados luego del 7 de marzo de 2000, se trata de una decisión impregnada del alto grado de discreción del foro de Instancia en el manejo procesal del caso. No debemos, con relación a determinaciones interlocutorias discrecionales procesales, sustituir nuestro criterio por el ejercicio de discreción del tribunal de Instancia, salvo cuando dicho foro haya incurrido en arbitrariedad o en un craso abuso de discreción, que no surge en esta instancia. Además, la misma reestructuración de calendarización, necesaria en esta causa, abona a que ello se permita. Meléndez Vega v. Caribbean International News, 2000 J.T.S. 108; Lluch v. España Service Sta., 117 D.P.R. 729, 745 (1986); Valencia, Ex Parte, 116 D.P.R. 909, 913 (1986); Ortiz Rivera v. Agostini, 92 D.P.R. 187,193 (1965).
Considerados todos los planteamientos de las partes, resolvemos que la Hon. Jueza Julia M. Garriga Trillo no abusó de su discreción al permitir la participación del perito y demás testigos de los demandados. Ello abona en beneficio de la dilucidación de las controversias, luego de que el foro de Instancia pueda escuchar y aquilatar toda la prueba de las partes para resolver el caso en sus méritos.
Es nuestra reiterada política judicial que los casos se ventilen en sus méritos y se prefiere la dilucidación en su fondo, con ánimo de hallar la verdad y hacer debida justicia. Rivera et al. v. Superior Pkg., Inc. et al., 132 D.P.R. 115 (1992); Mercado v. Panthers Military Soc. Inc., 125 D.P.R. 98 (1990); Echevarría Jiménez v. Sucn. Pérez Meri, 123 D.P.R. 664 (1989); Maldonado v. Srio. de Recursos Naturales, 113 D.P.R. 494, 498 (1982); Garriga Gordils v. Maldonado Colón, 109 D.P.R. 817 (1980); Acevedo v. Compañía Telefónica de Puerto Rico, 102 D.P. R. 787 (1974); Ramírez de Arellano v. Srio. de Hacienda, 85 D.P.R. 823, 829 (1962).
Todo proceso adjudicativo debe concentrase en los valores superiores de hallar la verdad y hacer justicia a las partes. Las reglas procesales persiguen viabilizar y facilitar la obtención de tales metas, no obstaculizarlas. Valentín González v. Crespo Torres, 98 J.T.S. 84; Pueblo v. Miranda Santiago, 130 D.P.R. 507 (1992); Echevarría Jiménez v. Sucn. Pérez Meri, supra; J.R.T. v. Aut. de Comunicaciones, 110 D.P.R. 879 (1981).
Por último, como regla general y de hermenéutica, debemos añadir que en las reglas procesales el formalismo sólo sirve para auxiliar en la búsqueda de la justicia, y sin este anhelo, como meta, pierden su razón y vigencia. El proceso judicial sólo se justifica como facilitador de las relaciones humanas de convivencia. La ley aborrece los extremos, máxime cuando no sirven otro fin que el de salvaguardar el propio tecnicismo en forma aislada. Quetglas v. Carazo, 93 J.T.S. 146; Gorbea v. Registrador, 93 J.T.S. 68; Machado v. Barranco, 119 D.P.R. 563 (1987); Ades v. Zalman, 115 D.P.R. 514 (1984); Piovanetti v. Vivaldi, 80 D.P.R. 108 (1957).
Dictamen
Conforme a lo expuesto y expedido el auto, resolvemos que Instancia no abusó de su discreción al autorizar la participación del perito y los testigos anunciados por los demandados-recurridos, durante el juicio. Ordenamos, además, el reinicio de los procedimientos ante Instancia, proveyendo que se le conceda a la parte demandante- *801 peticionaria, Sr. Vives Vázquez, tiempo razonable para deponer al perito anunciado por el E.L.A., y a los testigos anunciados por la A.A.A., de éstos expresar interés en hacerlo.
Lo acordó el Tribunal y lo certifica la Secretaria General.
Aida Heana Oquendo Graulau
Secretaria General
ESCOLIOS 2002 DTA 31
1. Circuito Regional de Bayamón, Panel II, designado como Panel Especial de Litigación Compleja, integrado por su Presidente, Juez Arbona Lago, y los Jueces Urgell Cuebas y Aponte Hernández.
2. Panel integrado por su Presidente, Juez Sánchez Martínez y las Juezas Cotto Vives y Ramos Buonomo.
3. Se ordenó su archivo en autos el 29 de marzo de 2000, con matasellos de_de abril de 2000, en cuanto al demandante Julio Vives Vázquez. Sin embargo, no fue hasta el 14 de abril de 2000, que se ordenó el archivo en autos de copia de la notificación enviada a los demandantes, Rosali Fernández Pola, et al.
4. Anejo I, Ap. a la pág. 9 (Memorando Consolidado del E.L.A., parte demandada).
5. Tercer señalamiento de error del peticionario, Sr. Vives Vázquez:
"Los límites establecidos por ley son inconstitucionales de su faz y en su aplicación al caso de autos, según esta aplicación ha sido hecha en la resolución recurrida."
Tercer señalamiento de error de la parte peticionaria, Fernández Pola, et al:

"Erró el Honorable Tribunal de Instancia al negarse a declarar inconstitucional la Ley de Pleitos contra el Estado según enmendada, Ley 104 del 29 de junio de 1955, 32 L.P.R.A. See. 3077, et seq."

6. Dos clasificaciones que dispone la Ley: (a) distingue entre reclamaciones de daños y perjuicios a base de quién sea el responsable por los mismos, Estado o ente privado, (b) hace distinción entre aquellos perjudicados cuyos daños exceden los límites dispuestos por la ley y los que sus daños no exceden éstos.
7. El Estado procura avanzar el interés de proteger el fisco, al contar con recursos de naturaleza limitada.
8. El Tribunal aclaró que los límites a cuantías compensables siempre tendrán algún elemento de arbitrariedad, pero que el mismo no es de tal magnitud que acarree la inconstitucionalidad de la Ley.
9. En esta jurisdicción no se ha empleado el escrutinio intermedio, véase: Disidente Universal de P.R. v. Depto. de Estado, 145 D.P.R._(1998), 12 junio 1998 (nota al calce #4); Almodóvar v. Méndez, 125 D.P.R. 218 (1990); León Rosario v. Torres, 109 D.P.R. 804 (1980).
10. Dicho argumento fue planteado en la opinión disidente del Hon. Juez Alonso Alonso, en Defendini, la cual fue rechazada por la mayoría del Tribunal.
11. Por considerar que los mismos están íntimamente relacionados, esta sección discutirá los siguientes errores en forma conjunta.
De los alegados por el Sr. Vives Vázquez

“Secundo error

Cometió error el Tribunal de Instancia al resolver que la fabricación de expedientes o carpetas utilizando como criterio rector las tendencias políticas e ideológicas de miles de personas, por distintos actores, en distintas fechas, contra distintas 
*802
personas y realizando cientos de miles de distintos actos, constituye un sólo acto o evento de carácter continuo. ”

De los alegados por la parte peticionaria, Fernández Pola et al.

“Primer Error

Erró el Honorable Tribunal de Instancia al equiparar la práctica de persecución y discrimen por ideología política llevada a cabo por el Estado durante varias décadas, a la confección de las carpetas o expedientes mantenidos por el Estado y concluir a base de ello, que dicha práctica era un sólo acto continuo sujeto al límite de $150,000.00 establecido en la Ley 104.

Segundo Error

Erró el Honorable Tribunal de Instancia en su aplicación de la Ley 104 a los hechos del presente caso y al determinar que todos los demandantes que reclamen por razón de la práctica declarada inconstitucional en los casos Noriega Rodríguez v. Hernández Colón, 122 D.P.R. 650 (1988) y Noriega v. Gobernador, 130 D.P.R. 919 (1992), son acreedores en únicamente y en conyunto al límite de $150,000, dispuesto en dicho estatuto, como compensación por los daños causados por el Estado.”
12. González Pérez v. E.L.A., 138 D.P.R. 31; Defendini Collazo v. E.L.A.., Cotto, 134 D.P.R. 28 (1993); Leyva et al. v. Aristud et al., 132 D.P.R. 489 (1983); De Paz Lisk v. Aponte Roque, 124 D.P.R. 472 (1989); Vázquez Negrón v. E.L.A., 113 D.P.R. 148 (1982); Galarza Soto v. E.L.A., 109 D.P.R. 179 (1979); Ramos Rivera v. E.L.A., 90 D.P.R. 817 (1964); Montes v. Fondo del Seguro del Estado, 87 D.P.R._1963).
13. El E.L.A. presentó su escrito en oposición el 6 de abril de 2000.
14. El E.L.A. le había enviado a la parte demandante el currículum vitae de su perito, Sra. Amanda Capó Rosselló, mediante carta el día 3 de marzo de 2000. La A.A.A., por su parte, presentó moción anunciando testigos el 25 de marzo de 2000.
15. Acompañó dicho recurso con moción en auxilio de jurisdicción, solicitando la paralización de la vista señalada para el 23 de mayo de 2000, la cual fue declarada Ha Lugar el 19 de mayo de 2000.
16. En la referida resolución del 5 de abril de 2000, el foro de Instancia le había reconocido a la parte demandante el derecho a deponer al perito y testigos anunciados.